Curia, fer

Dunkin, Ch.
This Court is well satisfied with the judgment of the Chancellor, that whatever might . have been the irregularities in the organization of the Oc- *323 mulgee Bank, they afford no ground of defence to the claims of the complainant.
A. A. 1818. Prince's Dig 61.
Ene. Tit. Banks.
The question, which ha-s been most elaborately discussed, and which is of most importance to the parties interested, is the claim of the complainant as a bill holder under ninth clause of the charter of the Ocmulgee Bank. The difficulties of the question were felt by the presiding Chancellor, who,'after stating the facts, and the objections of the defendants, commences the discussion of the point by observing, “I have, still, very considerable doubts whether any of these considerations throw the plaintiff without the remedies provided by the Legislature ■ of Georgia for holders of bills on the Ocmulgee Bankand he ultimately adopted the conclusion, that he-was entitled to the rank of a bill holder under the provisions of the charier.
This statute provides that “ the persons and property of the. stockholders, Jfor the time being, of said Bank, shall be pledged and bound, over and above the amount of said stock paid in, in proportion to the amount of the shares that each individual, copartnership, corporation or body politic, may hold in said Bank, for the ultimate redemption of the bills or notes issued by or from said Bank, in the same manner as in common commercial cases, or cases of debt.”
The principal object of obtaining an Act of incorporation, in ordinary cases, is that the liability of the stockholders should be limited to - the amount of their stock, and that their liability should cease when they cease to be stockholders. This clause would, therefore, in ordinary cases, defeat ■the leading purpose of the charter. But the laws of Georgia, with a view to the protection of her citizens from a,spurious currency, render it an offence highly penal- for any individual or incorporation, other than a chartered Bank, to -issue bills or promissory notes as private Bankers, “unless thereunto specially authorized by law.” In Georgia, therefore, an Act of incorporation vests in the stockholders óf a Bank high and exclusive privileges, and the Legislature thought proper to guard against the abuse of the privilege, and secure the interests of the public, by this stringent provision.
A standard authority upon such subjects has stated that, “Banks are of three kinds, viz: — of deposit, of discount, and of circulation.” After defining the appropriate functions of a Bank of deposit, as well as of a Bank of discount, he proceeds to the third class — “ a Bank of circulation issues bills or notes of its own, intended to be the circulating currency or medium of exchanges, instead of gold and-silver.” He adds that, “in the- United States, most of the-Banks-‘are public, and, in some of the States, private Banks of circulation are prohibited by law.” It might also have been added that, in this country, one Bank ordinarily unites the office of *324 the three, and serves as an. office of discount and deposit, as -well as a Bank of circulation. In order to preserve the Banks in a safe condition, and to prevenMhe currency from being debased and the community defrauded by an amount °f Bank bills in circulation disproporlioned to the means of redeeming them, the Act of 1832 provided that every Bank should make semi-annual returns to the Governor, upon the oath of the President and Cashier, in April and October, setting forth, among other things, the issues of the Banks, the amount of bills in circulation, &c. To this provision, some reference may hereafter be necessary.
It is quite obvious that, by the ninth clause of the charter, it was not intended to render the stockholders liable, as indi-vidhals or partners, for all the debts or contracts of the Bank, nor is it so contended; a bond creditor would,.confessedly, have no claim beyond the assets of the corporation. If the complainant had built the banking house, or had sold it to the Bank, for which they had .given him an unnegotiable note, or due bill, for five thousand dollars, signed. by the President and countersigned by the Cashier, this, by the express terms of the fifth clause, would be binding and obligatory on the company, and might be termed, literally, “a note or bill issued by said Bank,” in the terms of the ninth clause, yet no one would affirm that the stockholders were personally liable for this note or due bill, more than for a bond of the corporation. For the payment of such debts, the Legislature left every one to the protection of his own sagacity or vigilance. It was not, then, every bill or note of the Bank for which the stockholders were rendered liable, but only for those bills or notes which chartered Banks had the exclusive privilege of issuing; for Bank bills issued by virtue of its charter as a Bank of circulation — for, “ bills intended to be the circulating currency or medium of exchanges, instead of gold and silver.” Against bills thus putin circulation, as part of the currency, instead of gold and silver, it was well known the community had no practical means of protecting themselves, and those who asked for the privilege of thus supplying the circulating medium, were rendered personally responsible for the ultimate redemption of the bills. If the bills were not issued by the Bank by virtue of the privilege thus conferred upon them — if they were not bills issued for the purpose of forming part of the circulating medium of the country, they do not induce the mischief against which the law intended to provide, by fixing the personal responsibility of the stockholders. Ordinarily, the stockholders are respon-, sible for the acts of the directors of the Bank, only to the extent of the loss of their stock. But for creating a fictitious currency, for putting in circulation Bank bills to an amount which they have not the means of redeeming, the miscon *325 duct of the directors is visited upon the stockholders in their persons and property. The inquiry then is, whether the bills in the possession of the complainant came within this description.
The facts, are detailed in the testimony of Joseph A. White, the first and principal witness of the complainant. He was clerk to the Commissioners who received subscriptions to the Ocmulgee Bank. In November, 1839, he was elected Cashier, in which office he continued until 22d October, 1842, when he was succeeded by?- the complainant. The complainant was always a director of the Bank from its organization in April, 1837, until November, 1842. There seem to have been six directors besides the President. Mr. White testifies that Wm. B. Johnston & Co, commenced to make advances to the Bank as early as March or April, 1841. On the 31st May, 1841, the amount due to the complainant appeared in the weekly statement of the Bank, under the head of Bonds, and amounted to $80,000. In the latter part of May or beginning of June, 1841, a committee was sent from the South Western Rail Road Bank in Charleston, to examine the condition of the Bank, which they did, and reported to their principals. “In the latter part of June, or beginning of July, 1841,” continues Mr. White, “Mr. Johnston, being so much in advance, required security, and called on the Bank for it, and. the Bank put in his possession $50,000 of the bills of the Bank, on condition that, he was not to put them in circulation. Witness delivered them to him by order of the Board.” It will be thus observed that this was not an original agreement when the complainant commenced to make advances, but that his advances had been for some time at $80,000 before he required security. It will also be remarked, that security was not asked, nor were the bills put in his possession, until a month after the examination of the committee of the Rail Road Bank had closed. Although, if these circumstances had been different, it would not have varied the result. There can be no doubt of the fact, (for in this all the witnesses concur) that it was an express stipulation that the bills were not to be put in circulation. They were put in his possession, says White, on this condition. It is perfectly manifest that, so long as this condition attached, the bills constituted no part of the circulating medium of the country, and were not so intended, but that the contrary was expressly stipulated. Accordingly, when the semi-annual statements were prepared under the oath of the President and Cashier, as required by law, these bills were always brought in, and never appear in .the return as ‘ bills in circulation.’ Until they became a part of the circulation, the mischief contemplated by the ninth clause of the charter could not arise, and the liability of the stockhold *326 ers would not, therefore, attach. Whatever may have been the object of the complainant, or the views of the other directors, it would be great injustice to the stockholders, not only to make them liable for an excessive circulation, but for the contract of the directors that they should be liable as if there had been an excessive circulation. Seeing this obstacle, it is suggested that this condition against the circulation of the bills was to cease when the bonds to the complainant became due. It is very difficult to suppose that any bond was given to the complainant, although the amount due him appeared in the statement under the head of ‘ Bonds.’ His bill makes no such allegation. It is not stated nor charged that he ever held the bond or bonds of'the Bank for his debt. But this condition ivas of an extraordinary character. It is incumbent on the complainant to shew that it was limited as to time. If he held the bond of the company, which was not yet due, it was altogether unnecessary to make a. special stipulation that he should not use the collateral pledge until there had been a default of payment on the part of the Bank. Ordinary good faith would have held him to this condition without any promise or agreement. And the same reply may be made to the suggestion that the condition was to be removed so soon as his account with the Bank was closed and adjusted. It was not so stated in the original agreement. When his account was adjusted in September, 1842, the only change made was, that liis demand appears as “ a deposit bearing interest.” He still held the bills, and the Bank . was still liable to him for the accruing interest on the debt due to him. ' When the Bank broke up in November following, the balance of his debt still existed and the bills remained in his possession, so far as the Court can perceive from the evidence, with the original condition still attaching, that they were not to be put in circulation. The indebtedness of the Bank, as such, to the complainant, nor the proof of it, did not depend on these bills, but on the personal ledger, and his bank book, which was a transcript from it. For the payment of this debt, he is entitled to an account of all the assets of the corporation. But his demand on the stoclchold- ■ ers for the ultimate redemption of the bills depends on the proof, not of the indebtedness of the Bank, but that the bills have been in circulation. The evidence of the agreement is, that they were deposited on condition that they were not to be put in circulation — and the fact is, that they have not been circulated. The mere possession of the complainant is, m itself, not very important. If he had the right to circulate the bills whenever he thought proper, or when his debt became due and unpaid, although he had placed the bills for safe keeping as a special deposit in the custody of the Bank, his right, as a bill holder, would have been as perfect as if *327 they had remained in his own strong box. But if he held them, in that box, or in the Bank, on the express condition that they should not be circulated, they were no part of circulation or circulating medium, and had not acquired that character which would subject the stockholders to individuals, liability. One other view remains to be considered. It was strongly urged that, if no other termination to this condition was to be inferred, it must have been understood by the parties that it was to end when the doors of the Bank were closed in November, 1842, and it virtually ceased to exist. It is necessary to analyze this proposition, or, rather, suggestion, and the effect of it. The complainant was a director, and one of the agents of the stockholders, in July, 1841. By the terms of the charter, the stockholders are only ultimately responsible for the redemption of the bills issued by the Bank. They are only responsible when the assets of the Bank are exhausted and it has become insolvent. The agreement then, or understanding of the parties, according to this proposition, was that the complainant should not be at liberty to avail himself of his collateral security, should not be permitted to circulate these bills so as to render the stockholders liable, except in the event that the Bank failed or became insolvent. If there was any limitation to the condition, that the bills were not to be put in circulation, (and none certainly was specified) I think this would be the most probable inference. It was not like a deposit of any property of the Bank, but it was a deposit of paper, the peculiar benefit of which as a security to the party, could only be rendered available on the insolvency of the Bank, and it was stipulated that the bills should not be put in circulation but in that event. But the 40th section of the Act of 1833 declares that all contracts made by any Bank in contemplation of insolvency, except for the benefit of all the creditors and stockholders of the Bank, shall be void, and the President and Directors, or any of them, making, or consenting to, such contract, shall be deemed guilty of a misdemeanor, and. be subjected to punishment. It may be, that the penalties of this Act would only attach on contracts made in relation to the assets of the Bank. But the manifest policy of the law is to guard against all preferences in contemplation of insolvency. Assignments or other contracts, made m contemplation of insolvency, must be for the benefit of all the creditors and stockholders, or they are void. How can the directors make a contract that bills shall be put in circulation only in the event of insolvency, and that, not for the purpose of creating or adding to the circulating medium, an end which they can no longer accomplish, but for the purpose of giving a security to one of their own body, who is also a creditor of the institution 1 If the case were res integra, a majority of *328 the Court are of opinion that the complainant is not a bill holder within the perview of the ninth section of the charter.
But we agree with the Chancellor in the proposition which he has so fully sustained, both by reason and authority, that all other countries are bound to follow the construction of a statute which has been adopted by the Judiciary of the country where it was enacted. In the case of Collins v. The Central Bank, the report of the auditors has been submitted to us, but it does not, in any material point, vary the case as reported in 1 Kelly. It seems difficult to peruse the statement there presented, the able argument of the counsel, and the judgment of the Court, without clearly perceiving that, although the bills may have been considered as substantially placed in the custody of the stockholder as a conditional security, they were not entitled to the character of “ bills issued as contemplated by the charter of the company,” because they were “ not issued and put into circulation as money.” The language of the Judge is clear and emphatic. “ The bills were not issued as contemplated by the charter of the company, and the manner in which they are now attempted to be used for the purpose of placing the holders thereof on the same footing as the holders of bills issued and put into circulation as money, according to the terms of the charter, cannot receive the sanction of this Court. To permit it, would be, in our judgment, to sanction a fraud on the right of those bill holders whose bills are legitimately issued and put in circulation as money, according to the terms and provisions of the charter. On this ground of exception, we most cheerfully concur in opinion with the Court below.”
Nor does the subsequent case, Monroe R. R. and Banking Co. v. the Planters Bank, appear to the Court to afford any authority for the claim of the complainant as bill-holder under this clause of the charter. The Munroe R. R. Bank borrowed $>20,000 from the Planters Bank, in four promissory notes of $>5000 each, and, at the same time, deposited with them, as collateral security for the re-payment of the sum borrowed, $>20,000 of the bills of the Munroe Bank. There was no stipulation whatever in regard to these bills. The fourth note not having been paid, the Planters Bank claimed the benefit of their pledge as bill holders, and it was sustained. The report of the auditors says “ the Munroe Rail Road and Banking Company parted with the bills. The Planters Bank had the control and dominion of the bills, and could have passed them to others. The bills were, therefore, in the opinion of the auditors, issued by and from the Bank f and this was confirmed by the Court. How can it be said in this case that the complainant had the control and dominion of the bills, and could have passed them, to others, when *329 by the express terms of bis agreement he was “not to put the bills in circulation,” “trot to pass them to others?” If it had been part of the agreement with the Planters Bank that the bills were not to be put in circulation, and they received them on that condition, would not the same Court that decided Collins and the Central Rail Road Company have held that they, i, e. the holders of bills which were not to be put in circulation, were not on “ the same footing as the holders of bills issued and put into circulation as money according to the terms of the charter ?” The course of decisions in Georgia seems, then, entirely in accordance with the conclusions of this Court, that the complainant is not'entitled to the extraordinary remedies provided for a bill holder under the ninth clause of the Act.
Story Eq. Plead, s, 96.
But the complainant was a creditor of the Ocmulgee Bank for the amount ascertained by the directors to be due to him in September 1842, and is entitled, as such, to his proportion of the assets of that institution. This Court concurs with the Chancellor that the assignment of the assets of the institution to the South-western Rail Road Bank, under the orders of 22d November, 1842, was an infraction of the statute of December, 1833, prohibiting undue preferences, and is void. But it'is insisted on the part of the appellants that the relief granted to the complainant as a general creditor is not warranted by the pleadings, and that relief to the other creditors of the Ocmulgee Bank is not sought by the bill. It is not questioned that all the creditors of the Bank are interested in this fund, and it is a general rule of this Court that all parties interested should be represented, if it be practicable or be not attended with extraordinary difficulty. This rule and the reason of it is thus stated by Mr. Justice Story, at s. 76. a. The general rule ill Courts of Equity, as to parties, is that all persons materially interested in the subject matter ought to be made parties to the suit, either as plaintiffs or defendants, in order that complete justice maybe done, and that multiplicity of suits may be prevented, or, as Lord Hardwicke once said, in order to make the determination complete, and to quiet the question. The rigid observance of this rule would frequently be attended with inconvenience, and many exceptions have been engrafted on it. And where parties are all interested in a common fund, the Courts have adopted a course which enables them to do substantial justice, and that is by requiring the bill to be filed not only in behalf of the plaintiff, but also in behalf of all other persons interested who are not directly made parties (although, in a sense, they are thus made so) so that they may come in under the decree and take the benefit of it, or shew it to be erroneous, or entitle themselves to a re-hearing. At s. 103, it is said, a single creditor, in cases of this sort, would not be per *330 mitted by a Court of Equity to sue for his own single demand wjthout bringing the other creditors, in some form or man-nerj before the Court, from the obvious inconvenience and ap-pajent injustice in deciding upon the extent of their rights and interest in their absence. The substitution, therefore, of a few to sue for the benefit of the whole, at the same time that it subserves the interests of all the creditors, by enabling them to make themselves active in the final apportionment and distribution of the trust funds, gives to the watchful and diligent an opportunity of having prompt justice done to them without any wanton sacrifice of the rights of others, or any sacrifice not caused by the laches or indifference of the latter. These are principles not only well founded in reaspn but have been sustained by the general practice of Courts of Equity. Formerly much strictness was observed; and a creditor, who had sued only for his own debt, was not permitted to convert it into a bill in behalf of himself and all other creditors, as may be seen by reference to the cases of Leigh v. Thomas, Baldwin v. Lawrence. But in Milligan v. Mitchell it is said by the Chancellor that the Court had, at the hearing, been in the frequent habit of permitting a creditor who sued in his own name, to alter the title of his bill so as to make it a suit in behalf of himself and all other persons interested as creditors. We think the plaintiff is entitled to leave so to amend his bill in this case, and that it should be remanded to the Circuit Court for that purpose— and this is the more readily done as, on the further hearing, the effect of the proceedings in the Courts of Georgia in relation to the assets of the Ocmulgee Bank may be more fully and distinctly considered and determined.
2 Yes. Sen. 2 Sim l& Stu 18. l M. & Craig 511
Although the attempt on the part of the agents of the S. W. Rail Road Bank to secure a preference out of the assets of their debtor, the Ocmulgee Bank, has proved entirely ineffectual, and the assignment set aside as against the provisions of the law, this does not, in the judgment of the Court, operate a forfeiture of their debt also. It is not so declared by the statute, nor is the Court aware of any principle of Equity which exacts this penalty. A party can be permitted to derive no advantage from his own wrong. This seems the extent of the rule. The S. W. Rail Road Bank must be permitted to establish their claim like any other creditor of the Ocmulgee Bank.
The Court concurs also in the judgment of the Chancellor in relation to the irregularity of the proceedings by which the stock of Dr. Collins was forfeited and his notes, &c. given up, and the liability of the S. W. Rail Road Bank for any losses sustained in consequence of such surrender. But in relation to the transactions with H. G. Lamar and others, there is no charge in the bill, and the defendants had no opportunity of *331 answering in relation to these matters. It is enough that, in giving the complainant leave to amend the pleadings by con-v verting his bill into a creditor’s bill, he have leave also to make such charges as will put these matters properly in issue, and to make such other parties defendant as he may be i advised. This, in the judgment of the Court, he should be permitted to do, if a motion to that effect be submitted to the' Circuit Court.
No objeetion’was made at the hearing, nor is there any specific ground of appeal, in relation to that part of the decree which declares the liability of the S. W. Rail Road Bank for the advances made to the Ocmulgee Bank after the 7 Nov. 1842. It is only necessary to say, that in this respect the decree is affirmed, and on all other matters it is affirmed, modified or reformed as expressed in this opinion.
O’Neall, J. — Evans, J. — Wardlaw, J. and Dargan, Ch. concurred.

Decree modified.

Caldwell, Ch. on account of interest as a stockholder in the S. W. R. R. Bank, did not hear the case.